## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**EQT PRODUCTION COMPANY and**
**EQM GATHERING OPCO, LLC,**

      **Plaintiffs,**

    **vs.**

**UNION TOWNSHIP, MICHALLE**
**DUPRESS, SUZONNE BAYNHAM,**
**LARRY SPEER, CARL HANFORD, and**
**JOHN SEILER,**

      **Defendants.**

**No. _____**


**JURY TRIAL DEMANDED**

## COMPLAINT

COME NOW Plaintiffs EQT Production Company ("EQT Production") and EQM Gathering OPCO, LLC ("EQM"), by and through their undersigned counsel, and state as follows for their Complaint against Union Township (the "Township") and Township Board of Supervisors Michalle Dupree, Suzonne Baynham, Larry Speer, Carl Hanford, and John Seiler (collectively, "Defendants"):

### INTRODUCTION

1.    Dissatisfied with the fees and regulations that Pennsylvania law authorizes the Township to impose upon oil and gas activities within its borders, Defendants have engaged in escalating attempts to extract unlawful payments from EQT Production and EQM.[1]

---

[1] Plaintiffs EQT Production and EQM are affiliated oil and gas companies operating under the common ownership of non-party EQT Corporation ("EQT Corp."). EQT Production develops wells in southwestern Pennsylvania and produces gas from them. EQM, in turn, constructs pipeline systems that gather and deliver the gas produced from EQT Production's well pads to downstream locations so the gas can be sold. For the purposes of this Complaint only, and where appropriate, EQT Production and EQM are hereinafter referred to collectively as "EQT."

2.      Defendants' improper efforts started in early August 2024 by proposing an ordinance whereby anyone constructing an oil and gas pipeline within the Township would need to apply for and receive a $50,000 permit—backing down only after EQT Production promptly raised the multiple illegalities under state and federal law that such an ordinance would involve.

3.      Defendants were undeterred. In the following weeks and months, EQM applied to the Township in accordance with the Township's Code of Ordinances (the "Union Township Code") for a series of road crossing and temporary driveway permits needed to construct water and gas pipelines serving three recently completed, Township-approved EQT Production well pads. Defendants saw this otherwise routine permit application process as yet another opportunity to demand significant and unlawful payments from EQT.

4.      Indeed, Defendants have held (and to this day continue to hold) EQM's time-sensitive permits hostage for months, causing delays to both EQT Production's and EQM's operations that Defendants have used to try to leverage EQT.

5.      Defendants have made a series of escalating demands as a condition for issuing the requested permits: first demanding EQT's repair of a road slip that was caused by a third party at an estimated cost of $750,000 and, then, and most remarkably, demanding payment of a $50,000 monthly "fee" for EQT's continued right to do business within the Township. None of these demands were authorized by Pennsylvania law or the Union Township Code.

6.      After EQT made clear in mid-February 2025 that it would not repair the unrelated road slip nor make unlawful payments, Defendants' retaliation was swift.

7.      In a February 17, 2025 Board of Supervisors meeting held just days later, Defendants voted in a manner that continued to withhold the requested permits—despite having had more than 130 days to process them and despite the Township Engineer publicly confirming

to Defendants that EQM had satisfied the Union Township Code's applicable informational requirements for their issuance.

8.    Plaintiffs accordingly bring this action under 42 U.S.C. § 1983 to enjoin Defendants from their unconstitutional conduct and seek damages for the consequences of the same.

## PARTIES

9.    Plaintiff EQT Production is a Pennsylvania corporation that owns and operates oil and gas wells and associated production infrastructure in southwestern Pennsylvania. Its principal place of business is located at 625 Liberty Avenue, Suite 1700, Pittsburgh, Pennsylvania 15222.

10.    Plaintiff EQM is a Delaware limited liability midstream company that constructs pipeline systems in southwestern Pennsylvania. Its principal place of business is located at 2200 Energy Drive, Canonsburg, Pennsylvania 15317.

11.    Defendant Township is a second-class township located in Washington County, Pennsylvania. Its governing body consists of a five-member Board of Supervisors.

12.    Defendant Michalle Dupree is a resident of the Township and Chairperson of its Board of Supervisors. She is sued here in her individual capacity.

13.    Defendant Suzonne Baynham is a resident of the Township and Vice-Chairperson of its Board of Supervisors. She is sued here in her individual capacity.

14.    Defendant Larry Speer is a resident of the Township and a member of its Board of Supervisors. He is sued here in his individual capacity.

15.    Defendant Carl Hanford is a resident of the Township and a member of its Board of Supervisors. He is sued here in his individual capacity.

16.    Defendant John Seiler is a resident of the Township and a member of its Board of Supervisors. He is sued here in his individual capacity.

{16432840v7}

## JURISDICTION AND VENUE

17.    Subject matter jurisdiction exists under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because this is an action seeking redress under 42 U.S.C. § 1983 for the deprivation of constitutional rights.

18.    Personal jurisdiction exists over the Township because the Township is a second-class Township organized under the laws of the Commonwealth of Pennsylvania. Personal jurisdiction exists over the individual Defendants because they are natural persons domiciled in the Commonwealth of Pennsylvania.

19.    Venue exists under 28 U.S.C. § 1391(a) because Defendants are residents of the Commonwealth of Pennsylvania or, alternatively, under 28 U.S.C. § 1391(b) because the events or omissions giving rise to Plaintiffs' claims substantially occurred within this judicial district.

## FACTUAL ALLEGATIONS

### A.    Natural gas operations in southwestern Pennsylvania.

20.    Southwestern Pennsylvania lies atop the Marcellus Shale, a deep gas-bearing formation that has been opened to production through directional drilling and hydraulic fracturing.

21.    The process of extracting, transporting, and selling natural gas from the Marcellus Shale is a complex, heavily regulated, and capital-intensive process that requires years of development and the time-sensitive alignment of various moving pieces.

22.    Production companies (or producers) like EQT Production must first identify parcels of land that are capable of gas production; enter into leases for such land; obtain the necessary easements, rights-of-way, and regulatory permits to transform the land into well pads accommodating one or more wells; and construct the well pads and then drill and complete wells to produce gas from underground formations like the Marcellus Shale.

23.     In particular, completing these wells requires the use of millions of gallons of water that must either be trucked to a well pad or, as proposed here, transported by water pipelines like those EQM is seeking to construct within the Township.

24.     Once a well pad is completed and capable of producing gas, a producer like EQT Production then needs a way to get that gas to locations where it can be sold. To accomplish this goal, a producer will engage a midstream company like EQM to identify optimal routes for pipeline networks connecting the producer's well pads to market; obtain the necessary easements, rights-of-way, and regulatory permits to construct pipelines across those routes; and construct those pipeline networks to carry the producer's gas from its well pads to downstream locations so that the gas can be sold.

25.     The midstream services described above must proceed in lockstep with a producer's planned well development and gas production schedules in order to avoid costly delays.

26.     Indeed, without a sufficient water supply for completing the wells and without a pipeline system connected to its well pads, a producer like EQT Production does not otherwise have a means to produce, transport, and sell gas.

27.     This multiphase process of drilling and completing wells and constructing a pipeline system to transport gas so that it can be sold can require years of permitting and hundreds of millions of dollars to implement.

28.     And, given the highly interdependent nature of these operations, delays in any phase of this process can have significant and wide-ranging impacts on those involved, from industry actors down to the landowners who rely upon gas production royalties from producers like EQT Production to meet basic living expenses.

**B.      Natural gas operations in the Township.**

*1.      EQT Production applies for and receives conditional use permits to construct three well pads within the Township.*

29.      EQT has been part of the Township for years now and has, in the past, enjoyed a mutually beneficial relationship with the Township community and its officials.

30.      By way of background, EQT Production applied to the Township for conditional use permits (a "CUP" or the "CUPs") between 2018 and 2022 to construct, drill, and operate three separate well pads within its borders—Caton, Mingo, and Sarah (a "Well Pad" or the "Well Pads").

31.      EQT Production's CUP applications triggered a staggered process for each Well Pad that involved: various gateway fees; voluminous submissions (*inter alia*, proof of state regulatory permits, landowner approvals, leasing documentation, plans, schematics, geotechnical reports, and development schedules); review and approval by the Township's engineers, planning commission, and solicitor; and public notice, hearings, and testimony.

32.      Ultimately, in three separate unanimous decisions supported by findings of fact and conclusions of law, the Township's Board of Supervisors (the "Board") approved the issuance of a CUP for each of the Well Pads.

33.      Each approval, in turn, was subject to various terms and conditions, including an ongoing obligation on the part of EQT Production to consistently update the Township on well development schedules for the Well Pads.

34.      EQT Production relied on those CUP approvals to spend millions of dollars to construct the Well Pads.

*2.      EQT Production engages EQM to build a pipeline system to service the Well Pads.*

35.      After securing CUPs from the Township for the Well Pads, EQT Production engaged EQM, then an indirect subsidiary of Equitrans Midstream Corporation ("Equitrans"), to

construct two pipeline systems needed to serve the Well Pads: (a) a water pipeline system to deliver the millions of gallons of water needed to complete the wells to be drilled at the Well Pads; and (b) the necessary pipeline system for gathering EQT Production's anticipated gas volumes from the Well Pads and delivering those volumes to downstream locations.

36.    Sensitive to EQT Production's well development schedules (of which the Township was also aware), EQM took steps to commence construction on the contemplated pipeline systems described above.

37.    In the midst of these operations, EQT Corp. acquired Equitrans following a months-long, public acquisition process.

38.    As such, and for all relevant time periods described herein, EQT Production and EQM have been affiliated entities, with EQT Production operating on the production side and EQM operating on the midstream side.

3.    *The Township proposes a pipeline ordinance with a $50,000 application fee, which it abandons after feedback from EQT.*

39.    As these developments were taking shape, the Township's Planning Commission, which operates in tandem with the Board, held a meeting on June 17, 2024 to consider proposed oil and gas ordinances for the Township.

40.    At that meeting, a Planning Commission member publicly stated that the Township should try to "get as much money as we can" out of "deal[s]" with oil and gas companies operating in the Township, like EQT.

41.    A matter of weeks after this meeting, Defendants began considering a proposal consistent with that exhortation: an ordinance that would give the Township the power to regulate pipeline construction in the area by, among other things, charging oil and gas companies an exorbitant and unlawful $50,000 permit application fee for each proposed pipeline.

42.    Upon learning of this proposed pipeline ordinance, EQT contested the Township's authority to enact such an ordinance, resulting in Defendants abandoning their plan.

4.    *EQM applies for routine road crossing and temporary driveway permits.*

43.    On August 19, 2024, days after EQT petitioned against the Township's proposed pipeline ordinance, EQM—now an affiliate of EQT Production—submitted an initial round of applications to the Township for road crossing and temporary driveway permits needed to construct the pipelines required to serve EQT Production's Caton and Sarah Well Pads.

44.    Pursuant to the Second Class Township Code, Chapter 236 of the Union Township Code, Streets and Sidewalks (the "Road Ordinance"), prescribes the process for the Township's review and issuance of road crossing and temporary driveway permits to applicants like EQM. *See* 53 P.S. § 67322; *see also* Union Township Code, Chapter 236.

45.    The Road Ordinance expressly provides that, if a Township-required application and its contents satisfy the informational criteria set forth in the Ordinance, the Township "shall" issue these permits. *See* Union Township Code §§ 236-5, 236-6 & 236-7.

46.    For road crossing permits in particular, the Road Ordinance does not give the Township the power to impose any conditions on the issuance of such a permit outside of express application requirements; rather, the Road Ordinance only gives the Township the right to limit the scope of a road crossing permit itself with "such conditions … as the Township deems necessary for the protection of persons and property" *after* it has been issued. *See id*. § 236-7(B).

47.    On August 19, 2024, EQM submitted an initial round of permit applications on the Township-required forms and in accordance with the informational criteria set forth in the Road Ordinance.  Among other application submissions, EQM, identified for the Township the scheduled project commencement and completion dates for the work contemplated by each permit.

{16432840v7}

48.     Between September and October 2024, and once more on the forms created by the Township and in accordance with the informational criteria set forth in the Road Ordinance, EQM submitted an additional round of road crossing and temporary driveway permit applications to the Township—this time intended primarily to construct pipelines servicing EQT Production's Mingo Well Pad.

49.     This second round of applications brought the total number of pending applications before the Township to 17 (i.e., six (6) road crossing and eleven (11) temporary driveway) (the "Permits").

50.     During this span, EQT's representatives (acting on behalf of both EQT Production and EQM) worked to facilitate the Township's timely issuance of the Permits by responding to the Township's informational requests and meeting regularly with the Board and attending public meetings.

51.     But in the wake of its previously announced plan to try to get as much money as it can from oil and gas companies like EQT, the Township has used these otherwise routine permit applications as another opportunity to try to leverage EQT's now-integrated production and midstream operations in the Township.

    *5.*    *The Township attempts to hold up EQT's operations by engaging in a series of delay tactics with respect to the Permits.*

52.     By mid-November 2024, the Township had yet to act on any of the Permits.

53.     Then Defendants abruptly raised a series of issues concerning operations on the Well Pads—years after approving the CUPs for them and otherwise raising no issues as to EQT Production's compliance with those CUPs—that were either unrelated to the Permits and/or lacked foundation in the Union Township Code or other applicable law.

9

54.     Between November and December 2024, EQT repeatedly attempted to confer with the Township on these issues, while emphasizing the need for their timely resolution in light of EQT's schedules, which EQT had been communicating to the Township for years.

55.     EQT moreover expressed its willingness to meet with individual Defendants making up the Board—most of whom were not in office when EQT Production's CUPs for the Well Pads were approved—to address any outstanding questions regarding anticipated operations in the Township. But EQT's efforts largely went ignored by the Township.

56.     Although the Permits had been before the Township for months at this point, EQT's operational schedules would consequently remain unsettled through the new year.

6.      *The Township's improper tactics continue through the new year and culminate in a blatant extortion attempt in early February 2025.*

57.     At a January 20, 2025 meeting with the Board, the Township's Solicitor asserted that the Township would not issue the Permits unless EQT entered into a separate agreement with the Township, under which EQT would indemnify the Township for any and all claims arising out of the Permits while providing the Township with millions of dollars in insurance coverage.

58.     Despite the absence of any authority for the Township's attempt to condition the issuance of the Permits on a separate indemnification agreement, EQT—in a continued effort to keep its time-sensitive operations on schedule—attempted to satisfy this demand by promptly providing an agreement based upon a form it knew to have been previously approved by the Township Solicitor.

59.     The Township never responded to EQT's draft agreement.

60.     Meanwhile, Defendants escalated their demands upon EQT.

61.     Certain Township representatives separately made clear that the Township would not issue the Permits unless EQT further agreed to repair—at an estimated cost of $750,000—a

{16432840v7}

surface slip near a public roadway that an EQM pipeline would cross (the "Pumpkin Center Road Slip").

62.    After investigating the Pumpkin Center Road Slip with Township representatives, including the Township Engineer, EQT explained to the Township by letter that, while EQT's operations had not caused the Pumpkin Center Road Slip (such that EQT could not be responsible for repairing it), EQM's anticipated Permit for the associated roadway would nevertheless run north of its location, meaning that the Pumpkin Center Road Slip gave the Township no basis for holding up issuance of all 17 Permits.

63.    Then, at a February 4, 2025 meeting with EQT's Community Relations Specialist, Defendant Hanford demanded that EQT pay the Township an unlawful monthly fee of $50,000 (i.e., an amount equal to the application fee envisioned by the Township's discarded pipeline ordinance) if EQT wanted to continue conducting business in the Township.

64.    Defendant Hanford further indicated that if EQT refused to pay this "fee," the Board would deny the Permits.

65.    EQT's counsel promptly alerted the Township (and its Solicitor) by letter of Defendant Hanford's disturbing attempt at extortion, making clear that EQT would "never be a party to such an improper discussion."

7.    *The Township holds a series of public meetings in mid-February 2025 before failing to issue the Permits.*

66.    EQT continued to urge the Township to process and issue the Permits, while attempting to coordinate with the Township to ensure that the Permits would be an agenda item on the Board's upcoming February 12, 2025 meeting.

67.    At that meeting, the Township's Engineer told the Board that he had reviewed all of EQM's Permit applications against the informational criteria of the Road Ordinance and had no objections to the Township's issuance of the Pending Permits to EQM under the Ordinance.

68.    The Board nevertheless continued its decision on the Permits to February 17, 2025, on the premise that it needed time to review the underlying applications (which had been in its possession for over 130 days), as well as the follow-on indemnification agreement that the Township had demanded and received from EQT weeks prior (but never commented on).

69.    The Board did not approve the Permits at its February 17 meeting. Instead, on a motion spearheaded by Defendant Hanford, the Defendants voted not to approve the "agreement," a reference to the indemnification agreement required by the Township.

70.    The Board proceeded to adjourn the February 17 meeting with no further direction as to the Permits, leaving EQM's already-delayed pipeline construction projects in a continued state of limbo, and EQT Production without any assurance of a pipeline system for gathering its planned gas volumes from approved Well Pads that had cost millions of dollars to build.

8.    *The Township ignores EQT's final request for issuance of the Permits, leading to this action.*

71.    Three days after the February 17 meeting, EQT made a final request that the Township issue the Permits no later than February 27, 2025.

72.    The Township ignored this request, and the Permits remain unissued.

73.    As a result of the Township's improper failure to issue the Permits in accordance with its own Road Ordinance (and evident attempt, instead, to hold up EQT's Board-approved operations in the Township to extract exorbitant and illegal payments from EQT):

a.    EQM's legal entitlement to the Permits has been frustrated despite meeting the informational criteria of the Road Ordinance (as confirmed by the Township's own

{16432840v7}

Engineer), which makes the Township's issuance of the Permits to EQM mandatory;

b. EQM has suffered, and continues to suffer, financial harm and business disruption because its pipeline construction operations remain delayed (including, but not limited to, substantial daily delay payments to its subcontractors), and EQM is unable to perform the services that EQT Production engaged it to perform;

c. The Township has caused and continues to cause significant delays to Plaintiffs' lawful and integrated operations in the Township; and

d. EQT Production's schedules have been significantly delayed, leaving it with no place to send and sell its gas.

74.    At all relevant times, the Township acted under color of state law according to statements, ordinances, regulations, and/or decisions officially adopted and promulgated by its governing body, the Board.

75.    At all relevant times, the individual Defendants acted under color of state law by virtue of their positions on the Board.

**COUNT I**
**(42 U.S.C. § 1983 – First Amendment Retaliation / EQM)**

76.    Plaintiffs incorporate the allegations set forth in Paragraphs 1 - 75 as if fully set forth herein.

77.    The First Amendment to the United States Constitution, as incorporated against the States through the Fourteenth Amendment, provides that "Congress shall make no law … abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. am. I.

{16432840v7}

78.     EQM engaged in conduct protected under the First Amendment when it, acting directly or through its affiliate EQT Production, (a) objected to the Township's proposed pipeline ordinance and (b) objected to the Township's tying of the Permits to repair of the Pumpkin Center Road Slip (which EQT did not cause) and/or payment of a $50,000 monthly fee.

79.     Defendants retaliated against EQM for engaging in protected First Amendment conduct by withholding the Permits.

80.     Defendants' withholding of the Permits is sufficient to deter a person of ordinary firmness from exercising First Amendment rights where, as here, any delay in issuance of the Permits exposes EQM to millions of dollars in lost profits and other damages.

**WHEREFORE**, EQM demands judgment in its favor and against Defendants pursuant to 42 U.S.C. § 1983 for deprivation of its rights under the First Amendment, an injunction prohibiting Defendants from engaging in further retaliation against EQM, an award of compensatory damages against all Defendants, an award of punitive damages against the individual Defendants, an award of its reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and such further relief as this Court deems just and proper.

## COUNT II
### (42 U.S.C. § 1983 – First Amendment Retaliation / EQT Production)

81.     Plaintiffs incorporate the allegations set forth in Paragraphs 1 - 80 as if fully set forth herein.

82.     The First Amendment to the United States Constitution, as incorporated against the States through the Fourteenth Amendment, provides that "Congress shall make no law … abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. am. I.

{16432840v7}

83.    EQT Production engaged in conduct protected under the First Amendment when it (a) objected to the Township's proposed pipeline ordinance and (b) objected to the Township's tying of the Permits to repair of the Pumpkin Center Road Slip (which EQT did not cause) and/or payment of a $50,000 monthly fee.

84.    Defendants retaliated against EQT Production for engaging in protected First Amendment conduct by withholding the Permits, which Defendants know are required for its affiliate EQM to construct pipeline networks necessary to allow for the development of wells at EQT Production's Well Pads, along with the gathering and delivery of EQT Production's gas volumes to downstream locations so the gas can be sold.

85.    Defendants' withholding of the Permits is sufficient to deter a person of ordinary firmness from exercising First Amendment rights where, as here, any delay in issuance of the Permits exposes EQT Production to millions of dollars in lost profits and other damages.

**WHEREFORE**, EQT Production demands judgment in its favor and against Defendants pursuant to 42 U.S.C. § 1983 for deprivation of its rights under the First Amendment, an injunction prohibiting Defendants from engaging in further retaliation against EQT Production, an award of compensatory damages against all Defendants, an award of punitive damages against the individual Defendants, an award of its reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and such further relief as this Court deems just and proper.

**COUNT III**
**(42 U.S.C. § 1983 – Fifth Amendment Takings / EQM)**

86.    Plaintiffs incorporate the allegations set forth in Paragraphs 1 - 85 as if fully set forth herein.

87.     The Fifth Amendment to the United States Constitution, as incorporated to the States through the Fourteenth Amendment, provides that "nor shall private property be taken for public use, without just compensation." U.S. Const. am. V.

88.     Defendants have conditioned approval of the Permits upon EQT (a) repairing the Pumpkin Center Road Slip (which EQT did not cause) at an estimated cost of $750,000, and/or (b) paying the Township a $50,000 monthly fee.

89.     The above-referenced exactions lack an essential nexus to a legitimate government interest and are disproportionate to the projected impacts of the development to be authorized under the Permits.

**WHEREFORE**, EQM demands judgment in its favor and against Defendants pursuant to 42 U.S.C. § 1983 for deprivation of its rights under the Fifth Amendment, an injunction prohibiting Defendants from imposing unconstitutional conditions upon the issuance of the Permits, an award of compensatory damages against all Defendants, an award of punitive damages against the individual Defendants, an award of its reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and such further relief as this Court deems just and proper.

### COUNT IV
### (42 U.S.C. § 1983 – Fifth Amendment Takings / EQT Production)

90.     EQT incorporates the allegations set forth in Paragraphs 1 - 89 as if fully set forth herein.

91.     The Fifth Amendment to the United States Constitution, as incorporated to the States through the Fourteenth Amendment, provides that "nor shall private property be taken for public use, without just compensation." U.S. Const. am. V.

{16432840v7}

92.     As part of developing the Well Pads for production, EQT Production secured various oil and gas leases with surrounding landowners in the Township, which leases give EQT Production the right to produce gas from their properties for commercial sale.

93.     Defendants have withheld Permits that shall issue as a matter of Union Township Code and that are required for EQT Production's affiliate EQM to construct pipeline networks necessary for the production, transport, and sale of gas from the wells at EQT Production's Well Pads.

94.     Defendants' improper withholding of the Permits is thereby preventing EQT Production from deriving any economically beneficial value from the leases under which it holds oil and gas interests to be produced from the Well Pads.

**WHEREFORE**, EQT Production demands judgment in its favor and against Defendants pursuant to 42 U.S.C. § 1983 for deprivation of its rights under the Fifth Amendment, an injunction prohibiting Defendants from imposing unconstitutional conditions upon the issuance of the Permits, an award of compensatory damages against all Defendants, an award of punitive damages against the individual Defendants, an award of its reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and such further relief as this Court deems just and proper.

### COUNT V
### (42 U.S.C. § 1983 – Fourteenth Amendment Substantive Due Process / EQM)

95.     Plaintiffs incorporate the allegations set forth in Paragraphs 1 - 94 as if fully set forth herein.

96.     The Fourteenth Amendment to the United States Constitution provides that "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. am. XIV.

97.    EQM has a protected property interest in the Permits where the Township has a mandatory, non-discretionary duty to issue the same upon EQM's satisfaction of the application and informational requirements of the Road Ordinance, as EQM has done here (and as confirmed by the Township's own Engineer).

98.    Defendants' withholding of the Permits shocks the conscience where, as where, the Defendants have done so in an effort to extort unlawful concessions and fees, including (a) repair of the Pumpkin Center Road Slip (which EQT did not cause) at an estimated cost of $750,000 and/or (b) payment to the Township of a $50,000 monthly fee.

**WHEREFORE**, EQM demands judgment in its favor and against Defendants pursuant to 42 U.S.C. § 1983 for deprivation of its rights under the Fourteenth Amendment, an injunction prohibiting Defendants from imposing unconstitutional conditions upon the issuance of the Permits, an award of compensatory damages against all Defendants, an award of punitive damages against the individual Defendants, an award of its reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and such further relief as this Court deems just and proper.

### COUNT VI
### (42 U.S.C. § 1983 – Fourteenth Amendment Substantive Due Process / EQT Production)

99.    Plaintiffs incorporate the allegations set forth in Paragraphs 1 - 98 as if fully set forth herein.

100.    The Fourteenth Amendment to the United States Constitution provides that "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. am. XIV.

101.    EQT Production has a protected property interest in the leases under which it has the right to develop the oil and gas interests to be produced from wells on the Well Pads.

102.    Defendants' withholding of the Permits, thereby preventing construction of the pipeline networks EQT Production needs to produce and sell gas from the wells on the Well Pads, shocks the conscience where, as where, the Defendants have done so in an effort to extort unlawful concessions and fees, including (a) repair of the Pumpkin Center Road Slip (which EQT did not cause) at an estimated cost of $750,000 and/or (b) payment to the Township of a $50,000 monthly fee.

**WHEREFORE**, EQT Production demands judgment in its favor and against Defendants pursuant to 42 U.S.C. § 1983 for deprivation of its rights under the Fourteenth Amendment, an injunction prohibiting Defendants from imposing unconstitutional conditions upon the issuance of the Permits, an award of compensatory damages against all Defendants, an award of punitive damages against the individual Defendants, an award of its reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and such further relief as this Court deems just and proper.

**COUNT VII**
**(42 U.S.C. § 1983 – Fourteenth Amendment Equal Protection / EQM)**

103.    Plaintiffs incorporate the allegations set forth in Paragraphs 1 - 102 as if fully set forth herein.

104.    The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. am. XIV.

105.    EQM is similarly situated to other persons who have applied to the Township for road crossing and temporary driveway permits.

106.    Defendants have intentionally conditioned issuance of the Permits to EQM upon (a) repair of the Pumpkin Road Slip (which EQT did not cause) at an estimated cost of $750,000 and/or (b) payment to the Township a $50,000 monthly fee.

107.    Upon information and belief, Defendants have not imposed similar conditions on other applicants to the Township for road crossing and temporary driveway permits.

108.    Defendants' disparate treatment of EQM is intentional and without rational basis.

**WHEREFORE**, EQM demands judgment in its favor and against Defendants pursuant to 42 U.S.C. § 1983 for deprivation of its rights under the Fourteenth Amendment, an injunction prohibiting Defendants from engaging in disparate treatment of its applications for the Permits, an award of compensatory damages against all Defendants, an award of punitive damages against the individual Defendants, an award of its reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and such further relief as this Court deems just and proper.

### COUNT VIII
### (42 U.S.C. § 1983 – Fourteenth Amendment Equal Protection / EQT Production)

109.    Plaintiffs incorporate the allegations set forth in Paragraphs 1 - 108 as if fully set forth herein.

110.    The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. am. XIV.

111.    EQT Production is similarly situated to other persons or entities that own and/or hold leases to oil and gas interests within the Township's jurisdiction.

112.    Defendants have intentionally conditioned EQT Production's ability to develop its oil and gas interests within the Township's jurisdiction upon (a) repair of the Pumpkin Road Slip (which EQT did not cause) at an estimated cost of $750,000 and/or (b) payment to the Township a $50,000 monthly fee.

113.    Upon information and belief, Defendants have not imposed similar conditions on other persons or entities within the Township's jurisdiction.

{16432840v7}

114.    Defendants' disparate treatment of EQT Production is intentional and without rational basis.

**WHEREFORE**, EQT Production demands judgment in its favor and against Defendants pursuant to 42 U.S.C. § 1983 for deprivation of its rights under the Fourteenth Amendment, an injunction prohibiting Defendants from engaging in disparate treatment of its applications for the Permits, an award of compensatory damages against all Defendants, an award of punitive damages against the individual Defendants, an award of its reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and such further relief as this Court deems just and proper.

\*    \*    \*

Date: March 4, 2025                Respectfully submitted,

BABST, CALLAND, CLEMENTS & ZOMNIR, P.C.


By: */s/ Mark K. Dausch*_____
      Mark K. Dausch, Esquire
      PA I.D. No. 205621
      mdausch@babstcalland.com
      Joseph V. Schaeffer, Esquire
      PA I.D. No. 323256
      jschaeffer@babstcalland.com
      Sean R. Keegan, Esquire
      PA I.D. No. 316707
      skeegan@babstcalland.com
      Devlin E. Carey, Esquire
      PA I.D. No. 332768
      dcarey@babstcalland.com

      603 Stanwix Street
      Two Gateway Center, 6th Floor
      Pittsburgh, PA 15222
      (412) 394-5400
      (412) 394-6576 (fax)
      Firm I.D. No. 812

*Counsel for Plaintiffs EQT Production Company
and EQM Gathering OPCO, LLC*

{16432840v7}